UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LISA LOUCKS,

                    Plaintiff,

v.                                              CASE NO.: 8:26-cv-320

VIVO HEALTHCARE
CONSULTING LLC F/K/A VIVO
HEALTHCARE MANAGEMENT LLC,

                    Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, LISA LOUCKS ("Plaintiff"), by and through undersigned counsel, and brings this action against Defendant, VIVO HEALTHCARE CONSULTING LLC ("Defendant"), pursuant to the whistleblower retaliation provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), and the Florida Private Sector Whistleblower's Act, Fla. Stat. Ch. 448.101-105 ("FWA").

### JURISDICTION AND VENUE

1. This Court has federal question jurisdiction over the FCA claim pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

2. This Court has supplemental jurisdiction over the state law FWA claim pursuant to 28 U.S.C. § 1367, as it arises from the same common nucleus of operative facts.

3. Venue is proper in the Middle District of Florida because the Defendant conducts business in Polk County, Florida, and the events giving rise to this Complaint occurred within this judicial district.

## PARTIES

4. Plaintiff, LISA LOUCKS ("Plaintiff"), is a citizen of the United States and a resident of the State of Florida.

5. Defendant, VIVO HEALTHCARE CONSULTING LLC ("Vivo Healthcare" or "Vivo"), is a Florida limited liability company and conducts substantial business in multiple counties throughout Florida, including Polk County, Florida.

6. At all material times, Defendant Vivo Healthcare regularly submitted or caused to be submitted claims for payment for services to federal healthcare programs, including Medicare and Medicaid.

## GENERAL ALLEGATIONS

Background

7. Plaintiff was employed by Vivo Healthcare as Director of Reimbursement/Regional MDS Consultant from approximately June 9, 2025, through August 13, 2025.

8. In this role, Plaintiff was responsible for ensuring accurate Medicare and Medicaid billing through proper completion of Minimum Data Set ("MDS") assessments, Quality Measures ("QMs"), and compliance with the Patient Driven Payment Model ("PDPM") and all applicable federal and state regulations governing nursing home reimbursement.

9. The MDS is a federally mandated assessment tool used in Medicare- and Medicaid-certified nursing facilities to assess residents' functional capabilities and needs. The accuracy of MDS coding directly affects both the level of Medicare reimbursement and the quality measures publicly reported by the Centers for Medicare & Medicaid Services ("CMS").

10. Under the PDPM reimbursement system, Medicare pays nursing facilities based on resident characteristics and needs as documented in the MDS assessment. Inaccurate or unsupported MDS coding can result in inflated Medicare payments.

11. Specifically, PDPM calculates per-diem Medicare reimbursement directly from the clinical data entered in MDS assessments. When a facility codes an MDS assessment with unsupported clinical conditions, pain interviews conducted after the Assessment Reference Date, or functional ability scores lacking nursing documentation, the resulting PDPM classification generates a higher per-diem Medicare payment than the resident's actual documented condition supports. Each such claim submitted to Medicare constitutes a request for payment to the federal government at a rate to which the facility is not entitled. The MDS assessment is therefore the mechanism by which claims are generated, and inaccurate MDS coding is not merely a regulatory concern—it is the vehicle for submitting false claims.

<u>Discovery of Fraudulent Practices</u>

12. During her employment with Vivo Healthcare, Plaintiff discovered systematic practices of fraudulent Medicare and Medicaid billing, including but not limited to:

   a. Unsupported MDS Coding: MDS assessments coded with clinical conditions and functional limitations that lacked supporting documentation in the medical record, including:

      i. Pain interviews conducted and signed after Assessment Reference Dates ("ARDs"), rendering them invalid for coding purposes

      ii. GG functional ability scores coded without supporting documentation from Certified Nursing Assistants ("CNAs")

       iii. Clinical diagnoses coded on MDS assessments without physician documentation or appropriate timing of physician queries

  b. Improper Use of "Dashes": A systematic practice of avoiding the use of "dashes" (indicating inability to assess) on MDS items even when documentation was insufficient, specifically to avoid triggering Quality Measure declines or PDPM reimbursement reductions.

  c. Modification of Assessments Without Supporting Documentation: Multiple instances where Denise Morgan ("Ms. Morgan"), Director of Reimbursement, modified completed MDS assessments to remove dashes or change coding without obtaining supporting clinical documentation during the appropriate look-back periods.

  d. Pressure Ulcer Documentation Issues: Coding of pressure ulcers and wounds without adequate supporting documentation, including instances where wounds were coded based solely on physician order language rather than actual clinical assessment and documentation.

13. On June 12, 2025, after touring five newly acquired Tampa facilities, Plaintiff met with Vivo Healthcare's ownership (Shalom Friedland, Joseph Cukier, and Zev Gluck) and informed them that Vivo Healthcare was billing Medicare based on MDS assessments that lacked supporting clinical documentation, that pain interviews were being signed after Assessment Reference Dates rendering them invalid for coding purposes, and that these practices resulted in the submission of claims for higher reimbursement than was supported by the medical record. Plaintiff informed the owners that this constituted widespread fraud on the federal government.

14. Plaintiff specifically informed the owners that there were no User Defined Assessment ("UDA") forms or supporting paper documentation uploaded for pain interviews, and Ms.

Morgan was one of the people entering and signing pain interviews after the ARDs without supportive documentation.

15. Plaintiff informed the owners that, based on what she had observed, Vivo Healthcare's facilities would not pass audits and were not in compliance.

16. On June 13, 2025, at the direction of Vivo's owners, Plaintiff called CNO Jessica Cashaw to inform her of the unsupported documentation issues.

17. Cashaw stated the interviews were "most likely on paper." Plaintiff reiterated there were no UDAs or supporting paper documentation uploaded for the pain interviews and Ms. Morgan was one of the people entering/signing pain interviews after the ARDs without supportive documentation.

18. Plaintiff sent an email on June 13, 2025, regarding F-Tag 641: Accuracy of Assessments, further documenting compliance concerns.

19. On June 20, 2025, Plaintiff spoke with Laura Friedland (third-party MDS consultant) regarding physician query forms sent after ARDs, explaining that diagnoses needed to be in place on or before the ARDs. Friedland stated "it's all in the wording" on the form.

20. Plaintiff also discussed with Friedland an order set related to "HOB elevated related to SOB while lying flat" being used to capture special care high reimbursement. Plaintiff expressed concern that this order alone was insufficient documentation and would not pass audit. Friedland acknowledged the order "doesn't pass an audit in Maryland" and claimed no problems in Florida, while admitting she didn't know if it had ever been part of a Florida audit.

<u>Protected Activity and Complaints to Management</u>

21. On June 27, 2025, Plaintiff sent an email to COO Kasey O'Leary documenting that CNO Cashaw was not responding in a timely manner to Plaintiff's emails and texts regarding

compliance issues, which were impeding Plaintiff's ability to address fraudulent billing practices and support facility staff.

22. The June 27, 2025 email also documented specific compliance concerns Plaintiff discovered at St. Pete: "Yesterday, at St. Pete I found assessments inaccurately modified by Denise [Morgan] for higher reimbursement—there's no supportive documentation... Denise should not be providing inaccurate information to capture higher reimbursement or to not trigger a QM."

23. The email further documented that Plaintiff reviewed coding with the facility's MDS Coordinator and explained HIPPS codes, and "MDS said she didn't understand how a pressure ulcer on the heel could become a diabetic foot ulcer 'but Miss Denise said it could.'" Plaintiff referenced the RAI manual guidance distinguishing between these conditions.

24. On July 15, 2025, Plaintiff met again with all three owners (Shalom Friedland, Joseph Cukier, and Zev Gluck) at the FHCA Conference to discuss the ongoing unsupportive documentation issues. Plaintiff brought a folder of examples of insufficient documentation to support how claims to the federal government were being coded to the meeting.

25. Plaintiff provided Shalom Friedland with copies of trial UB-04 forms showing diagnoses had been added, along with wound documentation/wound notes for a resident (assessment coded by Ms. Morgan), demonstrating the systematic nature of the improper billing practices.

26. When asked if Laura Friedland (consultant) was aware, Plaintiff stated no, explaining she considered Friedland a third-party vendor. Shalom instructed Plaintiff to include Laura on all emails and communications going forward.

27. During this meeting, Plaintiff asked about the lack of weekly reimbursement calls with Ms. Morgan and Regina Schimmeyer. Plaintiff explained she was "used to having a weekly open discussion with the regional reimbursement team to review the buildings" to ensure everyone

was on the same page. When Plaintiff suggested implementing such calls, Ms. Morgan requested an agenda, and Plaintiff explained there was no formal agenda—only open communication about building issues. Zev Gluck responded, "I bet you didn't get very far," confirming Ms. Morgan refused to participate in collaborative compliance discussions.

28. During this meeting, Plaintiff asked if she should start looking for jobs. Shalom Friedland replied: "No, your job is very safe. We'll talk to Jessica and take care of this."

29. On July 24, 2025, Plaintiff sent an email adding to Ms. Morgan's email about "dashes," documenting proper MDS coding requirements regarding the use of dashes and the need for supporting documentation.

30. On July 25, 2025, Plaintiff sent an email to the Vivo MDS group regarding the upcoming SNF Validation Program, emphasizing the critical requirements:

   a. "We must have supportive documentation in place on or before the ARDs"

   b. "All interviews MUST be completed in the appropriate look back window"

   c. "If we have any interviews documented/signed AFTER the ARD, the assessment will not pass the validation audit"

31. On August 7, 2025, Plaintiff discovered that Laurellwood's Quality Reporting Program ("QRP") compliance for Q1 2025 had fallen below the 90% threshold due to improperly dashed items.

32. On August 8, 2025, Plaintiff logged into SimpleLTC to review whether there was supportive documentation to modify any of the MDS assessments containing dashes that were affecting the QRP. Plaintiff discovered that Ms. Morgan had already modified the assessments to remove the dashed items without obtaining or placing supportive documentation in the medical record

during the look-back periods—a clear violation of MDS coding requirements and a practice that would result in false claims for payment.

33. On August 12, 2025, Plaintiff was on-site at Vivo West Orange in Ocoee, where she provided GG/functional abilities training to nursing leadership and MDS staff. The training was well-received.

34. During this visit, MDS Coordinator Veronique asked Plaintiff what to do when pressure ulcers are known to exist but there is no documentation and the ARD has passed. Plaintiff correctly instructed her that she must dash the MDS items and work on improving the process going forward to ensure proper documentation. Plaintiff further instructed that Vivo's practice of never dashing items, even when dashing was the correct and compliant response, was improper.

35. The MDS Coordinator then modified an assessment for a resident with a July ARD and entered dashes as Plaintiff had instructed—choosing accurate coding over inflated reimbursement.

36. This represented a direct conflict between Plaintiff's instruction to follow compliant coding practices and Vivo's systematic practice of avoiding dashes to maintain higher reimbursement and Quality Measure scores.

    Retaliatory Termination

37. On August 13, 2025, while Plaintiff was on-site at Vivo Gandy in Tampa providing training and support to facility staff, CNO Jessica Cashaw abruptly terminated Plaintiff's employment, stating "you know, you and I have had trouble communicating so we decided to part ways."

38. The temporal proximity between Plaintiff's protected whistleblowing activities—particularly her meetings with ownership on June 12 and July 15, 2025, her instruction to staff to use compliant coding practices over improper practices that inflated reimbursement, and her

discovery that Ms. Morgan removed dashes without supporting documentation—and her sudden termination on August 13, 2025, establishes a clear causal connection.

<u>Good Faith Belief of FCA Violations</u>

39. Based on her extensive training, experience, and knowledge of Medicare and Medicaid billing requirements, MDS coding regulations, and the PDPM reimbursement model, Plaintiff held a good faith, objectively reasonable belief that Vivo Healthcare was violating the False Claims Act.

40. Specifically, Plaintiff reasonably believed that Vivo Healthcare was knowingly, or with reckless disregard or deliberate ignorance:

   a. Submitting false claims for Medicare payment based on MDS assessments that contained clinical coding without adequate supporting documentation;

   b. Submitting false claims for Medicare payment based on MDS assessments that included pain interviews and other resident interviews that were conducted and signed after the Assessment Reference Date, in violation of MDS coding requirements;

   c. Submitting false claims for Medicare payment based on MDS assessments where functional ability (GG) scores were coded without supporting documentation from nursing staff;

   d. Modifying MDS assessments to remove dashes and change coding after the appropriate look-back period had ended, without obtaining contemporaneous supporting documentation, resulting in claims for payment at higher reimbursement rates than were supported by actual documented care;

  e. Systematically avoiding the use of dashes on MDS assessments even when such dashes were the accurate and compliant response, specifically to avoid Quality Measure declines and to maintain higher PDPM reimbursement rates;

  f. Using inadequate physician order language (such as "HOB elevated related to SOB while lying flat") as the sole basis for coding special care high reimbursement, without adequate clinical documentation of the underlying condition; and

  g. Adding diagnoses to claims (UB-04 forms) after the fact to support higher reimbursement without adequate supporting documentation during the required time periods.

41. Each of the above practices results in the submission of false or fraudulent claims to Medicare and/or Medicaid in violation of 31 U.S.C. § 3729.

42. Defendant submits its claims for payment to Medicare using the UB-04 Claim Form (CMS-1450), which contains certifications that the information submitted is true and accurate. By submitting claims based on MDS assessments that contained unsupported clinical coding, pain interviews conducted after Assessment Reference Dates, and diagnoses added without adequate documentation, Defendant knowingly or recklessly disregarded the truthfulness of the information contained within the claim form, including the certification that the services billed were supported by adequate clinical documentation.

43. Plaintiff's activities in investigating these violations, internally reporting them to Vivo Healthcare's ownership and management, and attempting to ensure that proper documentation and coding practices were followed, constituted lawful acts taken in furtherance of an action under the False Claims Act.

44. Vivo Healthcare's ownership and management were put on notice through Plaintiff's reports and complaints that False Claims Act litigation was a reasonable possibility.

45. Plaintiff's reports to ownership were materially different from a generalized complaint about internal procedures or "billing and inventory" problems. Plaintiff identified the specific mechanism by which false claims were generated—unsupported MDS coding driving PDPM reimbursement—and provided physical documentation to ownership, including trial UB-04 forms showing diagnoses had been improperly added and wound documentation demonstrating the systematic nature of the fraudulent billing. Plaintiff explicitly connected the coding practices to claims submitted to the federal government, telling ownership that the facilities would not pass federal audits and that the billing practices constituted fraud. By providing this level of specificity and documentation, Plaintiff put Defendant on notice that its practices implicated potential False Claims Act liability—not mere internal coding disagreements.

46. Plaintiff's reports to Defendant's ownership went beyond the scope of her routine job duties as Director of Reimbursement. While Plaintiff's role included ensuring accurate MDS coding and Medicare billing, her reports to ownership did not merely identify coding errors requiring correction—they identified a systematic practice of submitting false claims to Medicare through unsupported MDS coding designed to inflate PDPM reimbursement. Plaintiff provided ownership with physical documentation, including trial UB-04 forms showing improper diagnoses, and specifically informed them that the facilities would not pass federal audits and that the practices constituted fraud on the federal government. By connecting the coding practices to false claims and warning of audit exposure, Plaintiff put Defendant on notice that its practices implicated potential liability under the False Claims Act, not merely

internal coding methodology disagreements. Defendant's ownership, which operates multiple Medicare-certified nursing facilities, knew or should have known that systematically billing Medicare based on unsupported MDS coding exposed it to FCA liability.

<u>Causal Connection Between Protected Activity and Termination</u>

47. The stated reason for Plaintiff's termination—that Plaintiff and Cashaw "had trouble communicating"—was pretextual.

48. The alleged communication difficulties were not a result of any deficiency in Plaintiff's communication or job performance but rather resulted from Cashaw's pattern of failing to respond to Plaintiff's compliance-related inquiries and requests for guidance necessary to address the fraudulent billing practices Plaintiff had discovered and reported.

49. Plaintiff's actual work performance was exemplary, as evidenced by:

   a. Positive feedback from facility staff regarding her training and support;

   b. Her proactive identification of compliance issues;

   c. Her development of educational materials and processes to improve compliance;

   d. The fact that she was preparing to conduct multiple facility QM reviews in the days following her termination;

   e. Comments from regional therapy director Gerritt Mallatt that he "always learned so much" from her; and

   f. The well-received GG training she provided at West Orange the day before her termination.

50. Despite Plaintiff's strong job performance and her compliance expertise, she was terminated immediately after:

    a. Instructing facility staff (August 12, 2025) to use accurate dash coding even when it would result in lower reimbursement—directly contradicting Vivo's systematic practice of avoiding dashes to inflate payments;

    b. Discovering (August 8, 2025) that Ms. Morgan removed dashes from assessments without supporting documentation to avoid QRP compliance issues; and

    c. Repeatedly reporting to ownership (June 12 and July 15, 2025) that Vivo's facilities would not pass audits due to fraudulent billing practices.

51. Between July 15, 2025—when ownership assured Plaintiff her job was "very safe"—and August 13, 2025, the only intervening events were Plaintiff's continued protected activity: her July 24 and July 25 emails documenting proper MDS coding requirements, her August 7 discovery of QRP non-compliance, her August 8 discovery that Ms. Morgan had removed dashes without supporting documentation, and her August 12 instruction to facility staff to follow compliant coding practices even when doing so would result in lower reimbursement. No performance issues, disciplinary actions, or warnings occurred during this period. The sole change in circumstances between ownership's assurance and Plaintiff's termination was Plaintiff's escalating efforts to stop the submission of false claims.

52. The temporal proximity between these protected activities and Plaintiff's termination, combined with ownership's prior assurances that her job was "very safe," demonstrates that Plaintiff was terminated in retaliation for her whistleblowing activities, not for any legitimate performance or communication issues.

53. There was no progressive discipline, no performance improvement plan, and no prior warnings that Plaintiff's employment was in jeopardy—further demonstrating the pretextual nature of the stated reason for termination.

## COUNT I – FCA PROHIBITED RETALIATION, 31 U.S.C. § 3730(h)

54. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 53 as set forth above.

55. At all relevant times, Defendant was an employer within the meaning of 31 U.S.C. § 3730(h).

56. At all relevant times, Plaintiff was an employee within the meaning of 31 U.S.C. § 3730(h).

57. As described above, Plaintiff engaged in protected activity under 31 U.S.C. § 3730(h) when she:

    a. Investigated and discovered Defendant's practices of submitting false claims to Medicare and Medicaid through inaccurate and unsupported MDS coding;

    b. Internally reported these fraudulent billing practices to Defendant's ownership and management on multiple occasions, including June 12, 2025, June 13, 2025, June 27, 2025, and July 15, 2025;

    c. Attempted to stop the submission of false claims by providing education and training to facility staff regarding compliant MDS coding practices;

    d. Instructed MDS staff that accurate coding practices must be followed even when such practices would result in lower reimbursement or Quality Measure declines;

    e. Documented instances of fraudulent coding and brought them to management's attention; and

    f. Took other efforts in furtherance of an action under the False Claims Act.

58. Plaintiff's conduct constitutes protected activity under both clauses of 31 U.S.C. § 3730(h)(1):

    (a) Plaintiff's actions were "lawful acts done... in furtherance of an action under this section" (the litigation clause), as her reports to ownership—which identified systematic false billing, provided physical documentation including UB-04 forms, and warned of audit exposure—

placed Defendant on notice that FCA litigation was a reasonable possibility; and (b) Plaintiff's actions were "other efforts to stop 1 or more violations of this subchapter" (the opposition clause), as her internal reporting, training of facility staff, and instruction to follow compliant coding practices were plainly efforts to stop the submission of false claims. The opposition clause does not require Plaintiff to demonstrate that FCA litigation was a "distinct possibility"—it protects any good-faith effort to stop FCA violations, including internal reporting to supervisors and efforts to correct improper billing practices.

59. Plaintiff held a good faith, objectively reasonable belief that Defendant was violating the False Claims Act by knowingly, or with reckless disregard or deliberate ignorance, submitting or causing to be submitted false claims for payment to federal healthcare programs.

60. Defendant was put on notice through Plaintiff's repeated reports and complaints that litigation under the False Claims Act was a reasonable possibility.

61. Defendant discriminated against, suspended, threatened, harassed, and discharged Plaintiff because of her lawful acts undertaken in furtherance of an action under the False Claims Act.

62. Plaintiff's protected whistleblowing activity was a motivating factor in Defendant's decision to terminate her employment.

63. The temporal proximity between Plaintiff's protected activity—particularly her July 15, 2025 meeting with ownership, her August 8, 2025 discovery of Morgan's improper modifications, and her August 12, 2025 instruction to facility staff to use compliant coding practices—and her August 13, 2025 termination establishes a causal connection between the protected activity and the adverse employment action.

64. The stated reason for Plaintiff's termination—communication difficulties with CNO Cashaw—was pretextual, as evidenced by:

    a. Ownership's prior assurances that Plaintiff's job was "very safe";

    b. The lack of any progressive discipline or performance improvement plan;

    c. The abrupt nature of the termination;

    d. The timing of the termination immediately following Plaintiff's compliance-related activities;

    e. Plaintiff's exemplary work performance;

    f. The fact that the alleged communication problems resulted from Cashaw's failure to respond to Plaintiff's compliance-related communications and requests for guidance necessary to address fraudulent billing practices; and

    g. The fact that Plaintiff's communications consistently focused on compliance issues and efforts to stop false claims submissions.

65. As a direct and proximate result of Defendant's retaliatory actions, Plaintiff has suffered significant damages as described above.

WHEREFORE, the Plaintiff, LISA LOUCKS, respectfully requests this Court enter a judgment that Defendant violated her rights under the False Claims Act and award relief including:

    a. Reinstatement of Plaintiff with the same seniority status she would have had but for the retaliation;

    b. Two (2) times the amount of back pay, with interest;

    c. Compensation for any special damages sustained as a result of the retaliation, including litigation costs, reasonable attorneys' fees, emotional distress damages, and damage to professional reputation; and

    d. Any such other relief this Court deems just and proper.

### COUNT II – VIOLATION OF THE FLORIDA PRIVATE SECTOR

## WHISTLEBLOWER'S ACT ("FWA"), FLA. STAT. § 448.102

66. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 53 as set forth above.

67. At all relevant times, Defendant was an employer within the meaning of Fla. Stat. § 448.101(2).

68. At all relevant times, Plaintiff was an employee within the meaning of Fla. Stat. § 448.101(1).

69. As described above, Plaintiff engaged in protected activity under Fla. Stat. § 448.102 when she objected to, and refused to participate in, actual violations of numerous laws, rules, and regulations, including but not limited to violations of federal Medicare and Medicaid requirements, including:

    42 CFR § 483.20 (Resident Assessment and MDS requirements)

    42 CFR § 483.70 (Administration, including compliance with federal, state, and local laws)

    The False Claims Act, 31 U.S.C. § 3729 et seq.

70. Plaintiff's objections to these violations of law, rule, and regulation were made in writing, including but not limited to:

    a. Email dated June 13, 2025, regarding F-Tag 641: Accuracy of Assessments;

    b. Email dated June 27, 2025, documenting inaccurate MDS coding and fraudulent billing practices;

    c. Email dated July 25, 2025, regarding MDS assessment accuracy and validation program requirements; and

    d. Multiple other communications to management regarding compliance violations.

71. Plaintiff also made oral reports of violations of law, rule, and regulation to Defendant's ownership and management, including during in-person meetings on June 12, 2025, and July 15, 2025.

17

72. Plaintiff had a good faith, reasonable belief that the practices she reported constituted violations of law, rule, or regulation, including 42 CFR § 483.20 (Resident Assessment requirements governing MDS accuracy and documentation), the RAI Manual requirements for MDS coding, and the False Claims Act, 31 U.S.C. § 3729 et seq.

73. Defendant's activities described above actually violated 42 CFR § 483.20, the CMS requirements governing MDS assessment accuracy and supporting documentation, and the False Claims Act, 31 U.S.C. § 3729 et seq.

74. Plaintiff's objections and reports were made to appropriate supervisory personnel, including the facility's Chief Nursing Officer and the company's ownership.

75. Defendant took retaliatory personnel action against Plaintiff by terminating her employment on August 13, 2025.

76. Plaintiff's protected whistleblowing activity and refusal to participate in violation of a law, rule, or regulation was the but-for cause of Defendant's decision to terminate her employment.

77. The temporal proximity between Plaintiff's protected activity and her termination, combined with the pretextual nature of the stated reason for termination, establishes that Plaintiff's whistleblowing was a contributing factor in the adverse employment action.

78. Defendant cannot establish by clear and convincing evidence that it would have taken the same personnel action in the absence of Plaintiff's protected whistleblowing activity, particularly in light of:

   a. Ownership's assurances that Plaintiff's "job is very safe";

   b. Plaintiff's exemplary work performance;

   c. The lack of any progressive discipline;

   d. The abrupt nature of the termination immediately following protected activity; and

  e. The pretextual nature of the stated reason for termination.

79. As a direct and proximate result of Defendant's retaliatory termination, Plaintiff has suffered significant damages as described above.

WHEREFORE, Plaintiff, LISA LOUCKS, demands judgment against the Defendant for damages and relief as follows:

  a. Compensatory damages for lost wages, benefits, and other remuneration, including front pay;

  b. Reinstatement to the same or an equivalent position, or front pay in lieu thereof;

  c. An injunction prohibiting any further retaliatory action;

  d. Compensation for emotional distress and damage to professional reputation;

  e. Plaintiff's attorneys' fees and costs pursuant to Fla. Stat. § 448.104; and

  f. Any such other relief this Court deems just and proper.

JURY DEMAND

80. Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 3rd day of February 2026,

      /s/ Frank M. Malatesta
      FRANK M. MALATESTA
      Florida Bar No.: 0097080
      MALATESTA LAW OFFICE
      871 Venetia Bay Boulevard, Suite 235
      Venice, Florida 34285
      Telephone No.: (941) 256-3812
      Facsimile No.: (888) 501-3865
      Frank@malatestalawoffice.com
      Staff@malatestalawoffice.com
      *Counsel for Plaintiff*